T.C. Memo. 2006-8

UNITED STATES TAX COURT

DESTA TAYE-CHANNELL AND BRUCE C. CHANNELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4166-04.              Filed January 18, 2006.

        The Telecommunication Relay Service (TRS) enables a
hearing-impaired individual to communicate with a hearing
individual over the telephone through the use of a relay
operator.  Ps subscribed to the AdaCom program which
provided an alternative to the TRS through the use of a
computer rather than a relay operator.  On their 2000
Federal income tax return, Ps claimed a disabled access
credit.  See sec. 44, I.R.C.  Ps also claimed a sec. 162,
I.R.C., trade or business expense deduction.  R disallowed
the credit and deduction.

        <u>Held</u>:  Because the AdaCom program was not acquired by
Ps in order for them to comply with the applicable
requirements of the Americans with Disabilities Act of 1990,
Pub. L. 101-336, 104 Stat. 327, the AdaCom program is not an
"eligible access expenditure" for purposes of sec. 44(c),
I.R.C.  <u>Svoboda v. Commissioner</u>, T.C. Memo. 2006-1.

        <u>Held</u>, <u>further</u>:  Ps are not entitled to deduct the cost
of the AdaCom program as a trade or business expense
pursuant to sec. 162, I.R.C., as they did not use the AdaCom
program in a trade or business.

Scott M. Estill and Stephanie F. Long, for petitioners.

Richard D. D'Estrada, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a deficiency of $1,935 in petitioners' Federal income tax for 2000.

The issues for decision are:

(1) Whether petitioners are entitled to claim a tax credit pursuant to sections 38[1] and 44 for their subscription to the AdaCom program (program);

(2) whether petitioners are entitled to claim a trade or business expense deduction under section 162 with respect to the program; and

(3) if petitioners are entitled to a credit and/or deduction for their investment in the program, the proper valuation of the program.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  At the time they filed the petition, petitioners resided in Denver, Colorado.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

During the year in issue, petitioners subscribed to the program, which was sold, sponsored, and administered by AdaCon Advantage Co., Inc. (AdaCom[2]).  AdaCom is a Colorado corporation headquartered in Colorado Springs, Colorado.  AdaCom developed a program to enable deaf or hearing-impaired individuals to communicate with hearing individuals and/or businesses.

Current Technology

A text telephone (TTY) is an electronic device that allows a person to type conversations over telephone lines.  TTYs do not amplify sound or convert speech to text.

A TTY user can use the Telecommunications Relay Services (TRS) to call a person using a standard telephone and vice versa. TRS is a system by which a hearing person and a deaf person can communicate over the telephone.  TRS employs a relay operator who receives the text from the deaf person.  The relay operator then reads the text to the hearing party.  When a hearing party provides a voice response, the relay operator types the text of the spoken message and transmits the text to the TTY.  TRS is available in all States in the United States and, as required by law, is provided free of charge by the local telephone company.

---

[2]  As the parties refer to the company as "AdaCom", for clarity we shall do the same.

Normal charges do apply to long distance telephone calls. TRS is available 7 days per week, 24 hours per day.

AdaCom Technology

During the year at issue, AdaCom maintained a computer with TTY software to allow a hearing-impaired person to use a TTY to call the AdaCom computer. The computer then sent the text to a program subscriber who was required to have a computer with a standard modem.

A program subscriber could also use his computer equipped with a modem to contact the AdaCom computer to initiate calls to a TTY user. The AdaCom computer was available 7 days per week, 24 hours per day.

If a program subscriber was unavailable when an attempt was made by the AdaCom computer to contact him, a message was transmitted that could be retrieved at a later time. Once a communication was completed, the text of the communication was deleted from the AdaCom computer.

Program subscribers were listed in the AdaCom yellow pages directory. The AdaCom yellow pages directory listed only the subscribers to the program and contained information on how to communicate with the subscriber by listing a number code to access the AdaCom computer.

AdaCom also maintained a Web site directory of its program subscribers. AdaCom listed only program subscribers on the Web site.

In addition to receiving a listing in the AdaCom yellow pages directory and on the Web site, the program entitled each program subscriber to 5 hours of interpretative services of a sign language interpreter. Additionally, the program entitled each program subscriber to 5 hours of audit defense, which consisted of representation before the Internal Revenue Service (IRS) to defend the claiming of the section 44 credit and associated deductions of the program. The audit defense services did not cover representation at the IRS Appeals level or the cost of litigation.

The Subscription

The subscription price of the program was $10,250 annually. The program subscribers were entitled to pay $2,500 in cash and provide $7,750 in promotional services to be performed by the program subscribers. The promotional service programs, which AdaCom valued at $7,750, were as follows: (1) Program A-11 referrals by the program subscribers; (2) program B-7 referrals by the program subscribers and the program subscribers were to display and distribute AdaCom brochures; and (3) program C-4 referrals by the program subscribers, and the program subscribers

were to display and distribute AdaCom brochures and display an AdaCom window decal.

AdaCom advised program subscribers to include $7,750 in income, deduct $5,250 as an ordinary and necessary business expense pursuant to section 162, and claim a credit equal to $5,000 pursuant to sections 38 and 44. The deduction of $5,250 comprised the $2,500 cash paid plus the excess of the promotional services income over the claimed credit amount--$7,750 minus $5,000, which equals $2,750. AdaCom issued a Form 1099-MISC, Miscellaneous Income, in the amount of $7,750 to each program subscriber.

None of the people referred by the program subscribers were required to subscribe to the program in order for the referring program subscriber to obtain credit towards the purchase price of the program.

Petitioners' Tax Return

During the 2000 tax year, petitioner Bruce Channell was employed as a financial analyst, and petitioner Desta Taye-Channell was employed as a job coordinator. For 2000, petitioners filed a Schedule C, Profit or Loss From Business, claiming a business of "Membership Sales and Prepaid Legal Services".

On December 30, 2000, petitioners subscribed to the program. Petitioners chose promotional service program C and furnished

four referrals in the subscription agreement.  Although promotional service program C required petitioners to display and distribute AdaCom brochures and display an AdaCom window decal, petitioner Bruce Channell testified that he did not remember whether he displayed an AdaCom window decal and that AdaCom did not check to see whether he had displayed a window decal or distributed brochures.

Petitioners paid AdaCom $2,500 and were credited with $7,750 in promotional services for a subscription to the program for the tax year 2000.

AdaCom issued a Form 1099 to petitioners in the amount of $7,750 for the 2000 tax year.  This amount represented the alleged bartering income from AdaCom for promotional services and was reported on petitioners' Schedule C for the taxable year 2000.  This was the only income reported on petitioners' Schedule C.

Based on their subscription to the program, petitioners claimed a $5,250 business expense deduction and a $5,000 section 44 credit on their income tax return for 2000.

Respondent determined a deficiency in petitioners' Federal income tax for 2000 in the amount of $1,935.  Respondent issued a notice of deficiency which stated:

> We adjusted your Schedule C, Gross Receipts, and Other
> Expenses.  The adjustments are to decrease income by
> monies recorded as received from bartering in the
> amount of $7,750.00, to disallow the advertising

expense/Other Expenses of $5,250.00 and to disallow the claimed disabled access credit of $5,000.00.

You have not established that any amounts were paid to AdaCon Advantage Company or, if paid, are ordinary and necessary business expenses. Accordingly, these amounts have been disallowed.

You have not established that any amounts were paid to AdaCon Advantage Company or, if paid, qualify for the Disabled Access Credit under Section 44 of the Internal Revenue Code. Accordingly, the credit has been disallowed.

Accordingly, your net Schedule C Income/Loss is adjusted $2,500.00 for taxable year ended December 31, 2000.

We have disallowed your claimed General Business Credit since you have not established that you are entitled to the credit.

OPINION

Burden of Proof

As a general rule, the notice of deficiency is entitled to a presumption of correctness, and the taxpayer bears the burden of proving the Commissioner's deficiency determinations incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a), however, provides that if a taxpayer introduces credible evidence and meets certain other prerequisites, the Commissioner shall bear the burden of proof with respect to factual issues relating to the liability of the taxpayer for a tax imposed under subtitle A or B of the Internal Revenue Code (Code). For the burden to shift, however, the taxpayer must comply with the substantiation and recordkeeping requirements as

provided in the Code and cooperate with the Commissioner.  See sec. 7491(a)(2).

Although petitioners claimed that section 7491(a) applies, petitioners failed to introduce sufficient evidence to shift the burden to respondent.  Nonetheless, our findings in this case are based on a preponderance of the evidence.  See Arevalo v. Commissioner, 124 T.C. 244 (2005).

ADA Tax Credit

Section 44(a) is included in calculating the general business credit pursuant to section 38.  Sec. 38(a) and (b). Section 44(a) provides a disabled access credit for an "eligible small business".  The amount of this credit is equal to 50 percent of the "eligible access expenditures" of an "eligible small business" that exceed $250 but that do not exceed $10,250 for the year.  Sec. 44(a).  Therefore, in order to claim the disabled access credit, a taxpayer must demonstrate that (1) the taxpayer is an "eligible small business" for the year in which the credit is claimed, and (2) the taxpayer has made an "eligible access expenditure" during that year.  If the taxpayer cannot fulfill both of these requirements, the taxpayer is not eligible to claim the section 44 credit for that year.

"Eligible small business" is defined as any person that had gross receipts of not more than $1 million for the preceding taxable year or not more than 30 employees during the preceding

year and elects the application of section 44 for the year.  Sec. 44(b).

"Eligible access expenditure" is defined as an amount paid or incurred by eligible small businesses for the purpose of complying with the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327.  Sec. 44(c)(1).  Such expenditures include amounts paid or incurred (1) for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities; (2) to provide qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (3) to acquire or modify equipment or devices for individuals with disabilities; or (4) to provide other similar services, modifications, materials, or equipment.  See sec. 44(c)(2).  Eligible access expenditures, however, do not include expenditures that are unnecessary to accomplish such purposes.  See sec. 44(c)(3).  Additionally, eligible access expenditures do not include amounts that are paid or incurred for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities with respect to any facility first placed in service after November 5, 1990.  See sec. 44(c)(4).

Petitioners contend that they are eligible to claim the disabled access credit under section 44(a) because (1) they had an eligible small business, and (2) their investment in the program was an eligible access expenditure. Respondent contends, among other things, that a subscription to the program is not necessary to comply with the ADA and thus is not an eligible access expenditure pursuant to section 44(c).

In order for an expenditure to qualify as an eligible access expenditure within the meaning given that term by section 44(c), the expenditure must have been made to enable an eligible small business to comply with the applicable requirements under the ADA. Arevalo v. Commissioner, supra; Fan v. Commissioner, 117 T.C. 32 (2001).

Title IV of the ADA requires "Each common carrier providing telephone voice transmission services" to provide "throughout the area in which it offers service, telecommunications relay services". 47 U.S.C. sec. 225(c) (2000). "Telecommunications relay services" is defined as:

> telephone transmission services that provide the ability for an individual who has a hearing impairment or speech impairment to engage in communication by wire or radio with a hearing individual in a manner that is functionally equivalent to the ability of an individual who does not have a hearing impairment or speech impairment to communicate using voice communication services by wire or radio. Such term includes services that enable two-way communication between an individual who uses a TDD or other nonvoice terminal device and an individual who does not use such a device. [47 U.S.C. sec. 225(a)(3).]

TTY supersedes the term TDD. 47 C.F.R. sec. 64.601(15) (2004). Congress further directed the Federal Communications Commission (FCC) to enforce these provisions and to:

(A) Establish functional requirements, guidelines, and operations procedures for TRS;

(B) establish minimum standards that shall be met;

(C) require that TRS operate every day for 24 hours per day;

(D) require that users of TRS pay rates no greater than the rates paid for functionally equivalent voice communication services with respect to such factors as the duration of the call, the time of day, and the distance from point of origin to point of termination;

(E) prohibit relay operators from failing to fulfill the obligations of common carriers by refusing calls or limiting the length of calls that use TRS;

(F) prohibit relay operators from disclosing the content of any relayed conversation and from keeping records of the content of any such conversation beyond the duration of the call; and

(G) prohibit relay operators from intentionally altering a relayed conversation.

47 U.S.C. sec. 225 (d) and (e).

As mentioned supra, all States utilize TRS and follow the aforementioned requirements. Since Congress mandated the adoption of TRS by common carriers, any place with a telephone is

currently in compliance with the ADA. Petitioners argue that the program is an alternative to TRS and provides improvements to TRS.

However, petitioners' subscription to the program did not enable them to comply with the ADA--they already were in compliance with the ADA through the use of TRS. Svoboda v. Commissioner, T.C. Memo. 2006-1. Therefore, the cost of the program is not an eligible access expenditure within the meaning of section 44(c), and, consequently, they do not qualify for the disabled access credit. Id. Respondent's determination disallowing the credit is sustained.

Section 162 Trade or Business Activity

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business. Sec. 162(a). The Supreme Court has stated that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Whether a taxpayer is in a

trade or business requires an examination of the facts and circumstances of each case. Higgins v. Commissioner, 312 U.S. 212, 217 (1941); see also Commissioner v. Groetzinger, supra at 36.

Respondent contends that petitioners were not in a trade or business within the meaning of section 162. Petitioners contend that they were in a trade or business entitled "Membership Sales and Prepaid Legal Services". However, petitioners offered no evidence other than the Schedule C and self-serving testimony regarding their business.

A tax return is merely a statement of a taxpayer's position and is not evidence of the correctness of the figures and information contained therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Moreover, the Court is not required to accept petitioners' unsubstantiated testimony. See Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964).

As petitioners reported no gross receipts on the Schedule C other than the bartering income and offered no documentary evidence whatsoever of the conduct of a business, we conclude that petitioners did not use the program in a trade or business, and petitioners are not entitled to a section 162 deduction for their subscription to the program.

Conclusion

We sustain respondent's determination in the notice of deficiency, decreasing petitioners' income by the amount of bartering services income reported and disallowing a section 44 credit and a section 162 deduction.  As we conclude that petitioners are not entitled to a section 44 credit or a section 162 deduction, it is unnecessary for us to decide the proper valuation of the program.

To reflect the foregoing,

Decision will be entered

for respondent.