T.C. Memo. 2006-30


UNITED STATES TAX COURT


RALPH E. AND MILDRED E. GALYEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5092-04.                    Filed February 22, 2006.


    The Telecommunication Relay Service (TRS) enables a
hearing-impaired individual to communicate with a hearing
individual over the telephone through the use of a relay
operator.  Ps subscribed to the AdaCom program which
provided an alternative to the TRS through the use of a
computer rather than a relay operator.  On their 2000, 2001,
and 2002 Federal income tax returns, Ps claimed a disabled
access credit.  See sec. 44, I.R.C.  Ps also claimed a sec.
162, I.R.C., trade or business expense deduction.  R
disallowed the credit and deduction.

    <u>Held</u>:  Because the AdaCom program was not acquired by
Ps in order for them to comply with the applicable
requirements of the Americans with Disabilities Act of 1990,
Pub. L. 101-336, 104 Stat. 327, the AdaCom program is not an
"eligible access expenditure" for purposes of sec. 44(c),
I.R.C.  <u>Taye-Channell v. Commissioner</u>, T.C. Memo. 2006-8;
<u>Svoboda v. Commissioner</u>, T.C. Memo. 2006-1.

Held, further: Ps are not entitled to claim a deduction under sec. 162, I.R.C., with respect to the AdaCom program.

Scott M. Estill and Stephanie F. Long, for petitioners.

Richard D. D'Estrada, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge: Respondent determined deficiencies of $3,323, $3,556, and $3,126 in petitioners' Federal income tax for 2000, 2001, and 2002, respectively.

The issues for decision are:

(1) Whether petitioners are entitled to claim a tax credit pursuant to sections 38[1] and 44 for their subscription to the AdaCom program (program);

(2) whether petitioners are entitled to claim a trade or business expense deduction under section 162 with respect to the program; and

(3) if petitioners are entitled to a credit and/or deduction for their investment in the program, the proper valuation of the program.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed the petition, petitioners resided in Colorado Springs, Colorado.

During the years at issue, petitioners subscribed to the program, which was sold, sponsored, and administered by AdaCon Advantage Co., Inc. (AdaCom[2]). AdaCom is a Colorado corporation headquartered in Colorado Springs, Colorado. AdaCom developed a program to enable deaf or hearing-impaired individuals to communicate with hearing individuals and/or businesses.

Current Technology

A text telephone (TTY) is an electronic device that allows a person to type conversations over telephone lines. TTYs do not amplify sound or convert speech to text.

A TTY user can use the Telecommunications Relay Services (TRS) to call a person using a standard telephone and vice versa. TRS is a system by which a hearing person and a deaf person can communicate over the telephone. TRS employs a relay operator who receives the text from the deaf person. The relay operator then reads the text to the hearing party. When a hearing party provides a voice response, the relay operator types the text of

---

[2] As the parties refer to the company as "AdaCom", for clarity we shall do the same.

the spoken message and transmits the text to the TTY. TRS is available in all States in the United States and, as required by law, is provided free of charge by the local telephone company. Normal charges do apply to long distance telephone calls. TRS is available 7 days per week, 24 hours per day.

AdaCom Technology

During the years at issue, AdaCom maintained a computer with TTY software to allow a hearing-impaired person to use a TTY to call the AdaCom computer. The computer then sent the text to a program subscriber who was required to have a computer with a standard modem.

A program subscriber could also use his computer equipped with a modem to contact the AdaCom computer to initiate calls to a TTY user. The AdaCom computer was available 7 days per week, 24 hours per day.

If a program subscriber was unavailable when an attempt was made by the AdaCom computer to contact him, a message was transmitted that could be retrieved at a later time. Once a communication was completed, the text of the communication was deleted from the AdaCom computer.

Program subscribers were listed in the AdaCom yellow pages directory. The AdaCom yellow pages directory listed only the subscribers to the program and contained information on how to

communicate with the subscriber by listing a number code to access the AdaCom computer.

AdaCom also maintained a Web site directory of its program subscribers. AdaCom listed only program subscribers on the Web site.

In addition to receiving a listing in the AdaCom yellow pages directory and on the Web site, the program entitled each program subscriber to 5 hours of interpretative services of a sign language interpreter. Additionally, the program entitled each program subscriber to 5 hours of audit defense, which consisted of representation before the Internal Revenue Service (IRS) to defend the claiming of the section 44 credit and associated deductions of the program. The audit defense services did not cover representation at the IRS Appeals level or the cost of litigation.

The Subscription

The subscription price of the program was $10,250 annually. The program subscribers were entitled to pay $2,500 in cash and provide $7,750 in promotional services to be performed by the program subscribers. The promotional service programs, which AdaCom valued at $7,750, were as follows: (1) Program A-11 referrals by the program subscribers; (2) program B-7 referrals by the program subscribers and the program subscribers were to display and distribute AdaCom brochures; and (3) program C-4

referrals by the program subscribers, and the program subscribers were to display and distribute AdaCom brochures and display an AdaCom window decal.

AdaCom advised program subscribers to include $7,750 in income, deduct $5,250 as an ordinary and necessary business expense pursuant to section 162, and claim a credit equal to $5,000 pursuant to sections 38 and 44. The deduction of $5,250 comprised the $2,500 cash paid plus the excess of the promotional services income over the claimed credit amount--$7,750 minus $5,000, which equals $2,750. AdaCom issued a Form 1099-MISC, Miscellaneous Income, in the amount of $7,750 to each program subscriber.

None of the people referred by the program subscribers were required to subscribe to the program in order for the referring program subscriber to obtain credit towards the purchase price of the program.

Petitioners' Tax Return

During the taxable years 2000, 2001, and 2002, petitioner Mildred E. Galyen was a retired teacher, and petitioner Ralph E. Galyen was employed as an insurance salesman for the Ralph Galyen Agency, Inc. (Galyen Agency), a Colorado subchapter S corporation. Petitioner Ralph E. Galyen was sole shareholder and president of the Galyen Agency during this period. The Galyen Agency provided insurance services to the general public. During

the years at issue, the Galyen Agency had less than $1 million in annual sales and fewer than 30 employees. The Galyen Agency subscribed to the program for the taxable years 2000, 2001, and 2002. On the subscription for each year, the Galyen Agency chose promotional service program C. The subscription contracts do not include the names of the referrals made by the Galyen Agency. The Galyen Agency paid AdaCom $2,500 and was credited with $7,750 in promotional services.

The gross income of the Galyen Agency for the taxable years 2000, 2001, and 2002 was $272,052, $210,847, and $21,803, respectively. These amounts included $7,750 each year as bartering income for promotional services from AdaCom.

On the basis of the subscriptions to the program, the Galyen Agency claimed a $5,250 business expense deduction and a $5,000 section 44 credit on Form 1120S, U.S. Income Tax Return for an S Corporation, for each of the years 2000, 2001, and 2002.

On their Form 1040, U.S. Individual Income Tax Return, for taxable years 2000, 2001, and 2002, petitioners reported Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., distributive shares of $83,324, $39,921, and $8,935 of nonpassive income from the Galyen Agency, respectively.

Respondent determined deficiencies in petitioners' Federal income tax for 2000, 2001, and 2002 in the amounts of $3,323, $3,556, and $3,126, respectively, after decreasing petitioners'

income by the amount of bartering services income reported and disallowing a section 44 credit and a section 162 deduction.

OPINION

Burden of Proof

As a general rule, the notice of deficiency is entitled to a presumption of correctness, and the taxpayer bears the burden of proving the Commissioner's deficiency determinations incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a), however, provides that if a taxpayer introduces credible evidence and meets certain other prerequisites, the Commissioner shall bear the burden of proof with respect to factual issues relating to the liability of the taxpayer for a tax imposed under subtitle A or B of the Internal Revenue Code (Code). For the burden to shift, however, the taxpayer must comply with the substantiation and recordkeeping requirements as provided in the Code and cooperate with the Commissioner. See sec. 7491(a)(2).

Although petitioners claimed that section 7491(a) applies, petitioners failed to introduce sufficient evidence to shift the burden to respondent. Nonetheless, our findings in this case are based on a preponderance of the evidence. See Arevalo v. Commissioner, 124 T.C. 244 (2005).

ADA Tax Credit

Section 44(a) is included in calculating the general business credit pursuant to section 38. Sec. 38(a) and (b). Section 44(a) provides a disabled access credit for an "eligible small business". The amount of this credit is equal to 50 percent of the "eligible access expenditures" of an "eligible small business" that exceed $250 but that do not exceed $10,250 for the year. Sec. 44(a). Therefore, in order to claim the disabled access credit, a taxpayer must demonstrate that (1) the taxpayer is an "eligible small business" for the year in which the credit is claimed, and (2) the taxpayer has made an "eligible access expenditure" during that year. If the taxpayer cannot fulfill both of these requirements, the taxpayer is not eligible to claim the section 44 credit for that year.

"Eligible small business" is defined as any person that had gross receipts of not more than $1 million for the preceding taxable year or not more than 30 employees during the preceding year and elects the application of section 44 for the year. Sec. 44(b).

"Eligible access expenditure" is defined as an amount paid or incurred by eligible small businesses for the purpose of complying with the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327. Sec. 44(c)(1). Such expenditures include amounts paid or incurred (1) for the purpose

of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities; (2) to provide qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (3) to acquire or modify equipment or devices for individuals with disabilities; or (4) to provide other similar services, modifications, materials, or equipment. See sec. 44(c)(2). Eligible access expenditures, however, do not include expenditures that are unnecessary to accomplish such purposes. See sec. 44(c)(3). Additionally, eligible access expenditures do not include amounts that are paid or incurred for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities with respect to any facility first placed in service after November 5, 1990. See sec. 44(c)(4).

Petitioners contend that they are eligible to claim the disabled access credit under section 44(a) because (1) they had an eligible small business, and (2) their investment in the program was an eligible access expenditure. Respondent contends, among other things, that a subscription to the program is not necessary to comply with the ADA and thus is not an eligible access expenditure pursuant to section 44(c).

In order for an expenditure to qualify as an eligible access expenditure within the meaning given that term by section 44(c), the expenditure must have been made to enable an eligible small business to comply with the applicable requirements under the ADA. Arevalo v. Commissioner, supra; Fan v. Commissioner, 117 T.C. 32 (2001).

Title IV of the ADA requires "Each common carrier providing telephone voice transmission services" to provide "throughout the area in which it offers service, telecommunications relay services". 47 U.S.C. sec. 225(c) (2000). "Telecommunications relay services" is defined as:

> telephone transmission services that provide the ability for an individual who has a hearing impairment or speech impairment to engage in communication by wire or radio with a hearing individual in a manner that is functionally equivalent to the ability of an individual who does not have a hearing impairment or speech impairment to communicate using voice communication services by wire or radio. Such term includes services that enable two-way communication between an individual who uses a TDD or other nonvoice terminal device and an individual who does not use such a device. [47 U.S.C. sec. 225(a)(3).]

TTY supersedes the term "TDD". 47 C.F.R. sec. 64.601(15) (2004). Congress further directed the Federal Communications Commission (FCC) to enforce these provisions and to:

(A) Establish functional requirements, guidelines, and operations procedures for TRS;

(B) establish minimum standards that shall be met;

(C) require that TRS operate every day for 24 hours per day;

(D) require that users of TRS pay rates no greater than the rates paid for functionally equivalent voice communication services with respect to such factors as the duration of the call, the time of day, and the distance from point of origin to point of termination;

(E) prohibit relay operators from failing to fulfill the obligations of common carriers by refusing calls or limiting the length of calls that use TRS;

(F) prohibit relay operators from disclosing the content of any relayed conversation and from keeping records of the content of any such conversation beyond the duration of the call; and

(G) prohibit relay operators from intentionally altering a relayed conversation.

47 U.S.C. sec. 225 (d) and (e).

As mentioned supra, all States utilize TRS and follow the aforementioned requirements. Since Congress mandated the adoption of TRS by common carriers, any place with a telephone is currently in compliance with the ADA. Petitioners argue that the program is an alternative to TRS and provides improvements to TRS.

However, petitioners' subscription to the program did not enable them to comply with the ADA--they already were in compliance with the ADA through the use of TRS. Taye-Channell v. Commissioner, T.C. Memo. 2006-8; Svoboda v. Commissioner, T.C.

Memo. 2006-1.  Therefore, the cost of the program is not an eligible access expenditure within the meaning of section 44(c), and, consequently, they do not qualify for the disabled access credit.  Respondent's determination disallowing the credit is sustained.

Section 162 Trade or Business Activity

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deductions claimed.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business.  Sec. 162(a).

Whether an expenditure is ordinary and necessary is generally a question of fact.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943).  Generally, for an expenditure to be an ordinary and necessary business expense the taxpayer must show a bona fide business purpose for the expenditure; there must be a proximate relationship between the expenditure and the business of the taxpayer.  Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650 (1962); Henry v. Commissioner, 36 T.C. 879 (1961).

To be "necessary" within the meaning of section 162, an expense need be "appropriate and helpful" to the taxpayer's business.  Welch v. Helvering, 290 U.S. 111, 113 (1933).  The requirement that an expense be "ordinary" connotes that "the

transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." <u>Deputy v. DuPont</u>, 308 U.S. 488, 495 (1940) (citing <u>Welch v. Helvering</u>, <u>supra</u> at 114).

Petitioners are not entitled to a section 162 deduction for their investment in the program.  The program was not ordinary, necessary, or helpful because petitioners were already in compliance with the ADA through the use of TRS.  Additionally, the program did not serve a valid business purpose.  Respondent's determination disallowing the deduction is sustained.

<u>Conclusion</u>

We sustain respondent's determination in the notice of deficiency, decreasing petitioners' income by the amount of bartering services income reported and disallowing a section 44 credit and a section 162 deduction.  As we conclude that petitioners are not entitled to a section 44 credit or a section 162 deduction, it is unnecessary for us to decide the proper valuation of the program.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.